**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

RASHA ALAWIEH,

*Petitioner-Plaintiff*,

v.

**Case No. 1:25-cv-10614 (LTS)**

[FIRST NAME UNKNOWN] TWEEDIE, Officer of U.S. Customs and Border Protection at the Boston Logan International Airport; [FIRST NAME UNKNOWN] KANE, Officer of U.S. Customs and Border Protection at the Boston Logan International Airport; CAROLINE R. TULLY, Officer of U.S. Customs and Border Protection at the Boston Logan International Airport; JOHN/JANE DOE, Acting Field Office Director of the Boston Field Office of U.S. Customs and Border Protection; PETER R. FLORES, Acting Commissioner, U.S. Customs and Border Protection; KRISTI NOEM, Secretary of the United States Department of Homeland Security; PAMELA BONDI, Attorney General, U.S. Department of Justice,

*Respondents-Defendants,*
*all named in their official*
*capacities.*

## MEMORANDUM OF LAW IN SUPPORT OF FIRST AMENDED HABEAS PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION……………………………………………………………………………...1

ARGUMENT…………………………………………………………………………………...2

   A.  THE EXPEDITED REMOVAL ORDER IS VOID AB INITIO BECAUSE IT WAS ISSUED IN VIOLATION OF THE APPOINTMENTS CLAUSE………………………...2

      1.  The Appointments Clause Requires Appointment of All Government Officials Exercising Significant Authority in Continuing Positions…………………………3

      2.  Respondents Tweedie, Kane, and Tully, Like Other Immigration Officers, Are Unappointed DHS Officers……………………………………………………..4

      3.  Respondents Tweedie, Kane, and Tully Exercised Significant Authority of the United States by Purporting to Issue an Expedited Removal Order Against Dr. Alawieh…………………………………………………………………………6

         i.  The Expedited Removal Framework………………………………………6

        ii.  The Expedited Removal Power is "Significant Authority" For Purposes of the Appointments Clause……………………………………………………8

      4.  Respondents Tweedie, Kane, and Tully, Like Other Immigration Officers, Are In "Continuing Positions Established by Law."……………………………………..15

      5.  Because the Expedited Removal Order Purportedly Entered Against Dr. Alawieh Was Issued by Unappointed Immigration Employees, It Must Be Vacated, and Dr. Alawieh's Visa Must Be Reinstated or Declared Valid…………………………...17

   B.  RESPONDENTS' APPLICATION OF EXPEDITED REMOVAL TO DR. ALAWIEH VIOLATES THE SUSPENSION CLAUSE…………………………………………...19

      1.  Dr. Alawieh Has Established "Substantial Connections" to the United States……19

      2.  Dr. Alawieh's Purpose for Leaving the United States Was Temporary……………21

   C.  THIS COURT HAS JURISDICTION OVER ALL OF DR. ALAWIEH'S CLAIMS, AND SHE HAS STANDING TO BRING THEM…………………………………………...23

CONCLUSION………………………………………………………………………………..25

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States*, 567 U.S. 387, 394–95 (2012) ........................................................ 9, 17

*Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11, 25 (D.D.C. 2022) ........................................ 17

*Auffmordt v. Hedden*, 137 U.S. 310, 327–28 (1890) .............................................................. 17

*Banks v. Gonzales*, 496 F. Supp. 2d 146, 149 (D.D.C. 2007) ................................................ 24

*Blanco Ayala v. United States*, 982 F.3d 209, 215 (4th Cir. 2020) ........................................ 11

*Boumediene v. Bush*, 553 U.S. 723, 739 (2008) .................................................................... 24

*Bowsher v. Synar*, 478 U.S. 714, 721 (1986) ........................................................................ 18

*Bridges v. Wixon*, 326 U.S. 135, 154 (1945) ........................................................................ 22

*Brooks v. Kijakazi*, 60 F.4th 735, 741 (4th Cir. 2023) .......................................................... 17

*Buckley v. Valeo*, 424 U.S. 1, 126 (1976) ...................................................................... 2, 3, 4

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ...................................................... 24

*D.A.M. v. Barr*, 486 F. Supp. 3d 404, 419 (D.D.C. 2020) .................................................... 23

*Delgadillo v. Carmichael*, 332 U.S. 388 (1947) .................................................................... 22

*Dep't of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 139 (2020) ............................... 9

*Dueñas v. Garland*, 78 F.4th 1069, 1072 (9th Cir. 2023) ...................................................... 14

*Dugdale v. Lynch*, 672 F. App'x 35 (D.C. Cir. 2016) ............................................................ 27

*Dugdale v. U.S. Customs & Border Prot.*, 88 F. Supp. 3d 1, 6 (D.D.C. 2015) .......................... 23

*Edmond v. United States*, 520 U.S. 651, 662 (1997) .......................................................... 2, 3

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv.*, 590 U.S. 448, 477 (2019) ..................... 10

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 590 U.S. 448, 457 (2020) ............... 3

*Free Enter. Fund v. Pub. Co. Oversight Bd.*, 561 U.S. 477, 498 (2010) ............................... 3, 18

*Freytag v. Commisioner*, 501 U.S. 868, 880–82 (1991) ..................................................... 2, 3, 9, 10

*Haitian Ctrs. Council,* 823 F. Supp. 1028, 1042 (E.D.N.Y. 1993) ........................................... 20

*Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 996–97 (9th Cir. 2012) ............................... 20

*Immigr. & Nationality Serv. v. Stevic*, 467 U.S. 407, 412–13 (1984) .......................................... 13

*INS v. St. Cyr*, 533 U.S. 289, 301 (2001) ......................................................................... 24

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012)......... 12

*Kansas City S. Ry. Co. v. Great Lakes Carbon Corp.*, 624 F.2d 822, 825 (8th Cir. 1980) .......... 23

*Khan v. Holder*, 608 F.3d 325, 327-29 (7th Cir. 2010) ......................................................... 10, 11

*Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 12 n. 3 (D.D.C. 2020) ................................................ 10

*Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) ............................................................... 22

*Kwong Hai Chew*, 344 U.S. 590, 600 (1953) ...................................................................... 19, 21

*Landon v. Plasencia*, 459 U.S. 21, 32 (1982) .................................................................... 9, 19, 22

*Lucia v. Securities & Exchange Comm'n*, 585 U.S. 237, 245 (2018) ................................. passim

*Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) ............................................ 20

*Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) ............................................... 24

*Neville v. Cavanagh*, 611 F. 2d 673, 675 (7th Cir. 1979) ....................................................... 24

*Nishimura Ekiu v. United States*, 142 U.S. 651, 662–63 (1892) .............................................. 9, 15

*Osorio-Martinez v. Attorney General United States of America*, 893 F.3d 153, 166 (3d Cir. 2018)

....................................................................................................................................... 24

*Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) .................................................................... 13

*Qassim v. Bush*, 466 F.3d 1073, 1078 (D.C. Cir. 2006) ......................................................... 24

*R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017) ..................................................... 14

*Rosenberg v. Fleuti* 374 U.S. 449, 458, 461 (1963) ............................................................. 22

*Ryder v. United States*, 515 U.S. 177, 182–86 (1995) ........................................................ 2, 17, 18

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 219 (2020)....................... 8, 13, 18

*Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 212 (1953) ...................................................... 21

*Sheboygan County v. Parker*, 70 U.S. 93, 96 (1865) ...................................................................... 17

*State v. Kennon*, 7 Ohio St. 546, 556 (1857) ................................................................................... 17

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)................................................... 24

*United States v. Arthrex, Inc.*, 594 U.S. 1, 22-23 (2021) ......................................................... 11, 12

*United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022).................................................. 16, 17

*United States v. Germaine*, 99 U.S. 508, 511 (1879)..................................................... 2, 4, 15, 16

*United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) .......................................... 16

*United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) ............................. 20, 21

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)....................................................... 19, 20

*Williams v. North Carolina*, 325 U.S. 226 (1945) ........................................................................ 23

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2................................................................................................................ 3

**Statutes**

8 U.S.C. § 1101(a)(18)........................................................................................................................ 5

8 U.S.C. § 1101(b)(4) ......................................................................................................................... 7

8 U.S.C. § 1105a ................................................................................................................................. 6

8 U.S.C. §§ 1182(a)(6)(C), (a)(7) ................................................................................................. 7, 13

8 U.S.C. § 1182(a)(9)(A) .................................................................................................................. 13

8 U.S.C. § 1225 ................................................................................................................................... 2

8 U.S.C. § 1225(b)(1) ................................................................................................................ passim

iv

8 U.S.C. § 1225(b)(1)(A) ............................................................................... 7, 8, 11

8  U.S.C.  § 1225(c) ............................................................................................. 6

8 U.S.C. § 1226(a) .............................................................................................. 6

8 U.S.C. § 1226(b) .............................................................................................. 6

8 U.S.C. § 1227(a)(1) .......................................................................................... 6

8 U.S.C. § 1229a .......................................................................................... 7, 18

8 U.S.C. § 1229a(b)(1) ...................................................................................... 14

8  U.S.C. § 1231(b)(3) ....................................................................................... 13

8 U.S.C. § 1231(c) ............................................................................................ 13

8 U.S.C. § 1252(a) .............................................................................................. 7

8 U.S.C. § 1252(a)(2)(A) ................................................................................... 12

8 U.S.C. § 1252(b) .............................................................................................. 6

8 U.S.C. § 1252(e)(2) ............................................................................. 12, 23, 24

8 U.S.C. § 1252(e)(4) ........................................................................................ 18

8 U.S.C. § 1252(e)(5) ................................................................................. 12, 23

8 U.S.C. § 1357(a)(1) ........................................................................................ 10

**Regulations**

8 C.F.R. § 1.2 ..................................................................................................... 5

8 C.F.R. § 3.1(b) .............................................................................................. 6, 7

8 C.F.R. § 3.1(h) ................................................................................................. 6

8 C.F.R. § 235.3(b)(2)……………………………………………………………….8

8 C.F.R. § 235.3(b)(2)(i) ................................................................................... 10

8 C.F.R. § 235.3(b)(7) ...................................................................................... 11

8 C.F.R. §§ 1003.1(b), (h)..................................................................... 7

8 C.F.R. § 1208.31(e) ......................................................................... 13

22 C.F.R. § 41.122(e)(2) ............................................................. 13, 14, 18

**Other Authorities**

Memorandum from the Solicitor General, U.S. Dep't of Justice, to Agency Gen. Counsels,

    *Guidance on Administrative Law Judges after Lucia v. SEC (S. Ct.)* 4 (July 2018),

    https://static.reuters.com/resources/media/editorial/20180723/ALJ--SGMEMO.pdf. .............. 4

Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73,

    110-11 (2007)............................................................................... 16

Rebecca Gambler, Director, Homeland Security and Justice, *U.S. Customs & Border Protection:*

    *Effort to Improve Recruitment, Hiring, and Retention of Law Enforcement Personnel*, U.S.

    Government Accountability Office, Report to Congressional Committees, 8 (Sept. 25, 2024)

    ("Gambler Report"), https://www.gao.gov/assets/gao-24-107029.pdf...................................... 5

U.S. Immigrants and Customs Enforcement, Fiscal Year 2024 Annual Report (December 19,

    2024), https://www.ice.gov/doclib/eoy/iceAnnualReportFY2024.pdf.................................... 17

## <u>INTRODUCTION</u>

Petitioner-Plaintiff, Dr. Rasha Alawieh ("Dr. Alawieh" or "Petitioner"), is a 34-year old doctor and specialist in transplant nephrology who sought to return to the United States on March 14, 2025, after a brief visit to see family in Lebanon. First Am. Habeas Pet. and Compl. for Declaratory and Injunctive Relief, ECF No. 34 ("Amended Petition") at ¶ 1. She hoped to return to the U.S. to resume life-saving and life-changing care for vulnerable patients in Rhode Island, on the basis of her H-1B employment visa, sponsored by Brown Medicine. *Id.* at ¶ 2.[1] Instead of allowing Dr. Alawieh to enter the U.S. to continue providing care to vulnerable patients in the United States and training future physicians—agents of U.S. Customs and Border Protection ("CBP") took custody of Dr. Alawieh, cancelled her visa, and subjected her to expedited removal from the United States without lawful authority or due process. *Id.* at ¶¶ 2, 4, 19, 27.

Dr. Alawieh was one of only three transplant nephrologists in Rhode Island. *Id.* at ¶ 10. In the course of the media coverage about Dr. Alawieh, physicians at Brown Medicine who have supervised her and/or who hired her have stressed that "'[h]er absence is really detrimental to our program,'" and that she "'"is a first-class human being—a very talented physician—and it will be America's loss if we can't have her back in Rhode Island.'" *Id.* at ¶ 11. Because of the dire patient needs this case implicates, *id.* at ¶¶ 8–9, Dr. Alawieh respectfully requests urgent resolution of her claims that (1) the role and authority of the CBP officers and (2) the procedures that they applied to their engagement with her violate the requirements of our Constitution.

---

[1] The Amended Petition mistakenly references Dr. Alawieh's employer to be Brown University Health. *Id.* at ¶¶ 1, 8, 10, 18, 25. It should have stated her employer to be Brown Medicine. *See id.* at n. 7 (citing and linking to article referencing her employer to be Brown Medicine).

## ARGUMENT

### A. THE EXPEDITED REMOVAL ORDER IS VOID *AB INITIO* BECAUSE IT WAS ISSUED IN VIOLATION OF THE APPOINTMENTS CLAUSE.

The expedited removal order at issue here is void *ab initio* because, in purporting to issue that order, Respondents-Defendants ("Respondents") Tweedy, Kane, and Tully exercised "significant authority pursuant to the laws of the United States," *Lucia v. Securities & Exchange Comm'n*, 585 U.S. 237, 245 (2018) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)), and "occupy a 'continuing' position established by law," *id.* (*quoting United States v. Germaine*, 99 U.S. 508, 511 (1879)). Am. Pet. at ¶¶ 4, 19, 27. Thus, the Constitution required these Respondents to be appointed consistent with the Appointments Clause, which they were not. *See Buckley*, 424 U.S. at 126.

Respondents Tweedy, Kane and Tully have illegally issued an expedited removal order to remove Dr. Alawieh from the United States. The Supreme Court has repeatedly held that the exercise of adjudicative power is reserved to Officers of the United States. *See, e.g.*, *Lucia*, 585 U.S. at 247–51; *Edmond v. United States*, 520 U.S. 651, 662 (1997); *Ryder v. United States*, 515 U.S. 177, 182–86 (1995); *Freytag v. Commissioner*, 501 U.S. 868, 880–82 (1991). Yet these Respondents exercised power putatively granted to them under 8 U.S.C. § 1225 to choose what to investigate, administer oaths, take testimony, render judgments about critical facts, and—most importantly—issue a final, binding, expedited removal order against Dr. Alawieh. Am. Pet. at ¶¶ 2, 4, 19, 27. This type of adjudicative power culminating in a decision with independent, unreviewable, and enormously significant effect cannot be constitutionally exercised by a federal employee who has not been appointed as an Officer in accordance with the Appointments Clause. This disregard for the Appointments Clause requires vacatur of the removal order issued against Dr. Alawieh and the vacatur of the related revocation of her visa as void *ab initio*.

1.  **The Appointments Clause Requires Appointment of All Government Officials Exercising Significant Authority in Continuing Positions.**

The Appointments Clause provides that:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the [S]upreme Court, and all other Officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. These requirements "[are] among the significant structural safeguards of the constitutional scheme." *Edmond*, 520 U.S. at 659. They maintain a "chain of dependence" between the President—in whom the Constitution vests executive power—and his subordinates. *Free Enter. Fund v. Pub. Co. Oversight Bd.*, 561 U.S. 477, 498 (2010). As such, the Appointments Clause is "designed to preserve political accountability relative to important government assignments." *Edmond*, 520 U.S. at 663. "The Framers understood . . . that by limiting the appointment power, they could ensure that those who wielded it were accountable to political force and the will of the people." *Freytag*, 501 U.S. at 884. The Appointments Clause applies "to all exercises of federal power." *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 590 U.S. 448, 457 (2020).

All "Officer[s] of the United States" must be "appointed in the manner prescribed in" the Appointments Clause. *Buckley*, 424 U.S. at 126; *see also Lucia*, 585 U.S. at 244 ("The Appointments Clause prescribes the exclusive means of appointing 'Officers'"). Specifically, the Appointments Clause creates a two-track system. The "default manner of appointment" for Officers is appointment by the President with the advice and consent of the Senate. *Edmond*, 520 U.S. at 660. As a limited exception to the "advice and consent" requirement, Congress can also authorize the President, a Department Head, or a court of law to appoint "inferior Officers." *Id.* at 662–63.

In such cases, "the final appointment must be made or approved by the Department Head personally; this authority cannot be delegated." Memorandum from the Solicitor General, U.S. Dep't of Justice, to Agency Gen. Counsels, *Guidance on Administrative Law Judges after Lucia v. SEC* (S. Ct.) 4 (July 2018), https://static.reuters.com/resources/media/editorial/20180723/ALJ--SGMEMO.pdf. The Department Head must personally approve of each individual appointed to the relevant position. *See id.* at 4–5. The Secretary is the Department Head for the Department of Homeland Security ("DHS"). Regardless of position or title, a federal government employee acts as an "Officer[] of the United States" for purposes of the Appointments Clause if: (1) the individual "exercis[es] significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, and (2) the exercise of that authority is "continuing," *Germaine*, 99 U.S. at 511– 12; *see also Lucia*, 585 U.S. at 245 (describing *Buckley* and *Germaine* as "set[ting] out [the Supreme] Court's basic framework for distinguishing between officers and employees" and thus determining whether appointment pursuant to the procedures specified in the Appointments Clause is required). In other words, an employee in a continuing position cannot exercise "significant authority pursuant to the laws of the United States" unless he or she has been appointed by the President or, with Congress's authorization, by a Head of Department or a court of law. *Buckley*, 424 U.S. at 126; *see also* Section (A)(4) of the Argument, *infra* at 15.

### 2. Respondents Tweedie, Kane, and Tully, Like Other Immigration Officers, Are Unappointed DHS Officers.

Respondents Tweedie, Kane, and Tully, who purported to order Dr. Alawieh's removal from the United States and by reviewing, approving, and/or signing order effectuating removal,

hold the position of "CBP officer."[2] Despite that title, CBP "officers" are not appointed as Officers of the United States in accordance with the Appointments Clause.

Specifically, all CBP officers are designated as "immigration officers." 8 C.F.R. § 1.2. The position of "immigration officer" is statutorily defined as "any employee or class of employees of the Service or of the United States designated by the [Secretary of Homeland Security],[3] individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title." 8 U.S.C. § 1101(a)(18).

Immigration officers, including CBP officers, are not appointed through the process required by the Appointments Clause. Neither the President nor the Secretary of Homeland Security appoints CBP officers, nor does the Secretary of Homeland Security personally approve the hiring of individual CBP officers. Instead, they are hired by CBP's Office of Human Resources Management following a security review by CBP's Office of Professional Responsibility. Rebecca Gambler, Director, Homeland Security and Justice, *U.S. Customs & Border Protection: Effort to Improve Recruitment, Hiring, and Retention of Law Enforcement Personnel*, U.S. Government Accountability Office, Report to Congressional Committees, 8 (Sept. 25, 2024) ("Gambler

---

[2] For purposes of this case, there is no constitutionally relevant difference between CBP officers and supervisory CBP officers, as neither are appointed in compliance with the Appointments Clause. Accordingly, this Petition will refers to the positions collectively as "CBP officers."

[3] This provision initially designated the Attorney General as the relevant Department Head for immigration officers. Since the enactment of the Immigration and Nationality Act ("INA"), Congress created DHS and transferred most of the authorities discussed herein to it. *See generally* Homeland Security Act of 2002, Pub. L. No. 107-296, 166 Stat. 2135 (codified at 6 U.S.C. §101 *et seq.*); *see, e.g.*, 6 U.S.C. §§251, 275, 291, 557. All statutory references in the INA to "Attorney General" now refer to the Secretary of Homeland Security, and references to the former Immigration and Naturalization Service ("INS") now refer to CBP, Immigration and Customs Enforcement ("ICE"), and/or U.S. Citizenship and Immigration Services ("USCIS").

Report"), https://www.gao.gov/assets/gao-24-107029.pdf. No approval or other participation by the Secretary of Homeland Security is required, nor typically involved. *Id.*

### 3. Respondents Tweedie, Kane, and Tully Exercised Significant Authority of the United States by Purporting to Issue an Expedited Removal Order Against Dr. Alawieh.

Notwithstanding that Respondents Tweedie, Kane, and Tully have not been appointed as Appointments Clause Officers, they have exercised expedited removal authority under 8 U.S.C. § 1225(b)(1) by ordering Dr. Alawieh removed from the United States, which resulted in their subsequent revocation of her valid visa. The power wielded by these CBP officers is "significant" within the meaning of the Appointments Clause.

### i. The Expedited Removal Framework

Expedited removal authority is a vast expansion in removal authority. Prior to 1996, any individual apprehended by immigration officers, whether apprehended at the border, at a port of entry, or in the interior of the United States, was entitled to a hearing (referred to as either an "exclusion proceeding" or "deportation proceeding," respectively) before an Immigration Judge. 8 U.S.C. §§ 1226(a), 1252(b) (1995).[4] The individual could appeal the Immigration Judge's exclusion or deportation order to the Board of Immigration Appeals ("BIA") and, thereafter, to an Article III court. 8 C.F.R. §§ 3.1(b)(1), (2) (1995); 8 U.S.C. § 1105a (1995). The Immigration and Nationality Act ("INA") also prescribed that the Attorney General, as the relevant Principal Officer, could review, approve, modify, or reverse any order of exclusion or deportation issued by an Immigration Judge. *See* 8 U.S.C. §§ 1225(c), 1226(b), 1227(a)(1), 1252(b) (1995); 8 C.F.R. § 3.1(h) (1995).

---

[4] When the INA was enacted in 1952, Immigration Judges were referred to as "special inquiry officers." *See* Dep't of Justice, *News and Information: Evolution of the U.S. Immigration Court System: Pre-1983* (last updated Apr. 30, 2015), https://www.justice.gov/eoir/evolution-pre-1983.

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104–208, 110 Stat. 3009–546 (amending 8 U.S.C. § 1101 *et seq.*). IIRIRA established two kinds of removal proceedings. The first, commonly referred to as "regular removal," is conducted by an appointed Immigration Judge and is subject to both administrative and federal court review, as was the case pre-IIRIRA. 8 U.S.C. §§ 1101(b)(4), 1229a, 1252(a); 8 C.F.R. § 1003.1(b), (h). The second is a new power under IIRIRA called "expedited removal." Under this procedure, immigration officers are granted final, unreviewable authority to summarily order non-citizens removed from the United States. Specifically, Congress authorized immigration officers to summarily remove non-citizens arriving to the United States, while also allowing the Secretary of Homeland Security to expand the category of non-citizens subject to expedited removal to include other non-citizens who have been within the United States for less than two years. 8 U.S.C. §§ 1225(b)(1)(A)(i), (iii).

Pursuant to this expedited removal power, any immigration officer may order a person's removal from the United States if that immigration officer determines—in the officer's discretion—that the person (1) is a non-citizen; (2) lacks a visa or "other valid entry document" or has made any material misrepresentation connected to their admission; and (3) has not affirmatively shown, to the satisfaction of the immigration officer, that he or she falls outside the geographical and temporal limitations to the application of expedited removal. 8 U.S.C. § 1225(b)(1)(A)(i) (citing *id.* §§ 1182(a)(6)(C), (a)(7)); *id.* § 1225(b)(1)(A)(iii). Under the INA as amended through IIRIRA, no review of such an order is available, whether for factual accuracy or legal authority. 8 U.S.C. § 1225(b)(1)(A)(i). CBP's own policy manuals note that only in "extraordinary circumstances" will it be "advantageous to the government to . . . institute [regular] removal proceedings if a solid expedited removal proceeding can be concluded." CBP Inspector's

Field Manual § 17.15(a)(2) (Feb. 10, 2006), https://www.aila.org/library/cbp-inspectors-field-manual [hereinafter "Field Manual"].

### ii. The Expedited Removal Power is "Significant Authority" For Purposes of the Appointments Clause.

The expedited removal power created by 8 U.S.C. § 1225(b)(1) is a quintessential significant authority of the federal government, for several independent reasons. This authority is adjudicative, sovereign, unreviewable, and discretionary; it carries collateral consequences; and it exceeds even the authority delegated to Immigration Judges, whom appellate courts have already found must be appointed as Officers under the Appointments Clause.

**Adjudicative Authority.** *First*, by purporting to issue an expedited removal order against Dr. Alawieh, Respondents Tweedie, Kane, and Tully exercised adjudicative authority. These Respondents resolved factual questions in placing Dr. Alawieh in expedited removal—including whether she had a valid entry document, when and how she had traveled to the United States, which activities she planned to carry out while in the United States, and whether she had made any material misrepresentation (for example, in her visa application). They applied legal standards (most notably, whether Dr. Alawieh should be subject to expedited removal), and then purported to issue a final and binding order resolving Dr. Alawieh's inadmissibility to the United States and ordering her removed (and kept in DHS custody until she was removed). *See* 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b)(2).

That exercise of adjudicative authority is "significant" such that it must be carried out by an appointed Officer. *See, e.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 219 (2020) (director of agency is an executive Officer where she "may unilaterally issue final decisions. . . in administrative adjudications"); *Lucia*, 585 U.S. at 248-49 (holding that adjudicative authority was "significant authority" even though reviewable by an Officer). Indeed, Respondents acted and

continue to act not only as the adjudicator (subject only to the review of a fellow unappointed CBP officer), but also as investigating officers and prosecutors—a combination of powers even more significant than those found to require appointment in previous cases. *See, e.g.*, *Freytag*, 501 U.S. at 881– 82 (special trial judges were Officers where, despite lacking power to issue final adjudicative orders, they had authority to "take testimony, conduct trials, rule on the admissibility of evidence, and . . . enforce compliance with discovery orders"); *Morrison v. Olson*, 487 U.S. 654, 671–72 (1988)**Error! Bookmark not defined.** (special counsel with authority to investigate and prosecute crimes was an Officer despite lack of authority to adjudicate or penalize); *Nishimura Ekiu v. United States*, 142 U.S. 651, 662–63 (1892) (immigration inspectors were Officers where they had authority "to inspect and examine [non-citizens]"; "to administer oaths, and to take and consider testimony touching the right of any such [non-citizens] to enter the United States"; and to make decisions about "the right of any [non-citizen] to land"). Here, where officials issue orders that have "last-word capacity," *Lucia*, 585 U.S. at 249, the requirement of appointment is clear.

**Sovereign Authority.** *Second*, by ordering Dr. Alawieh expelled from this country, Respondents Tweedie, Kane and Tully exercised the "broad, undoubted," and "inherent power" of the federal government to admit or exclude individuals from the United States. *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). The decision of whether to admit or exclude a person from the country is a quintessentially sovereign authority of the United States. *See, e.g.*, *Dep't of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 139 (2020) ("[T]he power to admit or exclude [non-citizens] is a sovereign prerogative") (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)). Dating as far back as the first immigration acts, the Supreme Court identified that governmental agents making final immigration determinations are to be appointed as Officers. *See Nishimura Ekiu*, 142 U.S. at 660 ("[T]he final determination of those facts may be in trusted by congress to

*executive officers*") (emphases added). A position tasked with determining whether a person may be excluded from the United States is thus "an office that exercises national power," *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv.*, 590 U.S. 448, 477 (2019) (Thomas, J., concurring), and is therefore subject to the Appointments Clause.

**Discretionary Authority.** *Third*, Respondents Tweedie, Kane, and Tully exercised "significant discretion," *Freytag*, 501 U.S. at 882, in deciding to order Dr. Alawieh removed from the United States, another sign of their significant authority. These Respondents decided whether and to what extent to conduct an investigation or inquiry into the facts they deemed relevant to their adjudication and what process was due in conducting any such investigation or inquiry. For example, an agent has authority to "interrogate any [non-citizen] or person [they] believe[] to be a[] [non-citizen]," 8 U.S.C. § 1357(a)(1), by conducting an unrecorded interview that can take place without any witnesses and need not include a translator unless the agent deems it necessary. *See* 8 C.F.R. § 235.3(b)(2)(i). That brief encounter, the substance of which is entirely within the agent's control and discretion, forms the principal basis for the agent's factual and legal determinations and his or her decision to issue an order of removal. *See, e.g.*, *Khan v. Holder*, 608 F.3d 325, 327-29 (7th Cir. 2010); *see also Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 12 n. 3 (D.D.C. 2020) (DHS "has 'sole and unreviewable discretion' to 'designate[ ]' for expedited removal 'any or all' noncitizens who are deemed inadmissible"); Field Manual § 17.15(a)(1) ("It is the responsibility of the officer to determine whether the [non-citizen] is an arriving [non-citizen] subject to being placed in expedited removal proceedings."); *id.* at § 17.15(a)(2) ("The authority to formally order a[] [non-citizen] removed from the United States without a hearing or review, carries with it the responsibility to accurately and properly apply the grounds of inadmissibility.").

This process grants tremendous discretion to an agent making inadmissibility determinations. *Id.* For example, the agent has the sole and unreviewable discretion to determine that a non-citizen with an otherwise valid visa or entry document intends to violate the terms of the visa or entry document (such as the length of stay or intention to work). *See, e.g.*, *Khan*, 608 F.3d at 326–27. The speed with which expedited removal determinations are made and the language barriers frequently involved exacerbate the risks of such significant discretion. *Id.* at 329; *see also, e.g.*, *Blanco Ayala v. United States*, 982 F.3d 209, 215 (4th Cir. 2020) ("Discretion lies at the heart of the DHS law enforcement function."). This significant, unilateral power is unparalleled in U.S. law and cannot be vested in an unappointed employee.

**Unreviewable Authority.** *Fourth*, the authority vested in CBP officers like Respondents Tweedie, Kane, and Tully by the expedited removal process is "significant" because many aspects of the discretion and power they wield are unreviewable by either an appointed Officer or Immigration Judge. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 22-23 (2021) (Administrative Patent Judges are Officers where, *inter alia*, "Congress has assigned them 'significant authority' in adjudicating the public rights of private parties, while also insulating their decisions from review," and subjecting them to removal only for cause). Such lack of review creates an "independent effect" for the authority at issue, indicative of Officer status. *Lucia*, 585 U.S. at 248–49.

No appointed Officer needs to review or approve an expedited removal order to effectuate it. To the contrary, IIRIRA eliminated any mechanisms by which the Secretary of Homeland Security or Attorney General could review, approve, modify, or reverse an expedited removal order or any of its predicate factual determinations. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (b)(1)(B)(iii), (b)(1)(C). So long as a "second line supervisor" (another unappointed position) approves an expedited removal order, the order becomes final. *See* 8 C.F.R. § 235.3(b)(7). In cases such as Dr.

Alawieh's, there is no avenue for review of the expedited removal order by an appointed Officer. By comparison, the Supreme Court found in *Lucia* that administrative law judges at the Securities and Exchange Commission ("SEC") had to be appointed pursuant to the Appointments Clause due to the SEC's ability to decline to review their decisions, even though the SEC had the ability to conduct such review. *Lucia*, 585 U.S. at 237, 243. Here, nobody within the DHS has the authority to review expedited removal decisions.

Moreover, IIRIRA severely limits judicial review of expedited removal orders. Habeas corpus petitions challenging expedited removal orders are limited to determinations of whether the petitioner (A) "is an [non-citizen]," (B) "was ordered removed under [§ 1225(b)(1)]," and (C) "can prove by a preponderance of the evidence that the petitioner is a[] [non-citizen] lawfully admitted for permanent residence, has been admitted as a refugee, . . . or has been granted asylum." 8 U.S.C. § 1252(e)(2). IIRIRA eliminated review of challenges to the "implementation or operation of an order of removal," "the application of [§ 1225(b)(1)] to individual [non-citizens]," and the "procedures and policies adopted by the Attorney General to implement the provisions of [§ 1225(b)(1)]" are all unreviewable, § 1252(a)(2)(A), and so is "whether the [non-citizen] is actually inadmissible or entitled to any relief from removal," *id.* § 1252(e)(5). In other words—even in the event of judicial review—the INA has amended by IIRIRA provides no avenue for review of plainly erroneous findings of facts or law that an individual is inadmissible. In short, when Respondents Tweedie, Kane and Tully issued Dr. Alawieh an expedited removal order, they "b[oun]d the Executive Branch." *Arthrex*, 594 U.S. at 23.[5]

---

[5] The final, unreviewable nature of many of the determinations underlying an expedited removal order makes the power to issue that order an authority that can properly be exercised only by a principal Officer, not an inferior Officer. *See, e.g., Arthrex*, 594 U.S. at 3 ("[T]he unreviewable executive power exercised by [Administrative Patent Judges] is incompatible with their status as inferior officers."); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1340 (D.C. Cir. 2012) (Copyright Royalty Judges were principal Officers because their determinations

**Consequential Authority.** Finally, the consequences of Respondents Tweedie, Kane, and Tully's exercise of the expedited removal power are by any measure "significant." Dr. Alawieh, like any other individual against whom an expedited removal order has been issued, was detained and removed from the country almost immediately. 8 U.S.C. § 1231(c). "[T]he power to seek daunting . . . penalties against private parties on behalf of the United States" is "a quintessentially executive power," *Seila Law*, 591 U.S. at 219, and "deportation is a particularly severe 'penalty,'" *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) (citation omitted).

There are also significant collateral consequences. People like Dr. Alawieh who are issued expedited removal orders are subject to a five-year bar on admission to the United States, unless they qualify for and obtain a discretionary waiver. 8 U.S.C. §§ 1182(a)(9)(A)(i), (iii). Likewise, in connection with their unlawful expedited removal order, Respondents revoked Dr. Alawieh's visa. 22 C.F.R. § 41.122(e)(2). Similarly, non-citizens issued expedited removal orders after having been found inadmissible based on misrepresentations are subject to a lifetime bar on admission to the United States unless they are granted a discretionary exception or waiver. *See* 8 U.S.C. § 1182(a)(6)(C). Individuals who experience persecution or harm following an expedited removal order and subsequently seek to reenter the United States to seek protection are at risk of felony prosecution for illegal reentry, *id.* § 1326, are ordinarily deemed ineligible for asylum, and are only eligible for a more limited form of relief called withholding of removal, 8 C.F.R. § 1208.31(e); 8 U.S.C. § 1231(b)(3).[6] And, once an immigration officer purports to issue an

---

were "not reversible or correctable by any other officer or entity within the executive branch," even though their procedural rules and legal determinations were reviewable by a principal Officer). However, because Respondents Tweedie, Kane, and Tully were not appointed at all, the Court need not determine whether they are principal Officers or merely inferior Officers.

[6] While not relevant here, withholding of removal claims are subject to a higher burden of proof than asylum claims. *See Immigr. & Nationality Serv. v. Stevic*, 467 U.S. 407, 412–13 (1984). Additionally, withholding of removal does not prohibit the government from removing the non-

expedited removal order, DHS regulations purport to allow that immigration officer to revoke any visa that the U.S. State Department has granted to the subject of the expedited removal order. 22 C.F.R.§ 41.122(e)(2). In other words, visas, which are issued in the normal course by an Officer under the Appointments Clause, are revocable by the decision of unappointed CBP employees.

**Authority Exceeding That of Immigration Judges.** The conclusion that the roles held by Respondents Tweedie, Kane, and Tully are the kind that require appointment is confirmed by comparison to properly appointed Immigration Judges and members of the Board of Immigration Appeals ("BIA"). Outside of the expedited removal context, Immigration Judges issue removal orders subject to review by Article III courts.[7] The Ninth Circuit recently confirmed that Immigration Judges and BIA members are Officers because they occupy a continuing position and, most importantly, "exercise significant authority within our immigration system." *Dueñas v. Garland*, 78 F.4th 1069, 1072 (9th Cir. 2023). The most significant authority they exercise is issuing removal orders. *Id.* at 1073. The *Dueñas* court held that, since Immigration Judges "conduct adversarial hearings in removal proceedings . . . that combine factual and legal analysis and that order suitable remedies," and BIA members "perform substantive appellate review of Immigration Judges' removal determinations," both were Officers. The court cited 8 U.S.C. § 1229a(b)(1), which grants Immigration Judges the authority to take testimony from non-citizens, receive evidence, rule on the admissibility of evidence, consider credibility of witnesses, and exercise significant authority and discretion in issuing removal orders, similar to the Administrative Law Judges at issue in *Lucia*. *Id.* Such adjudicative authority can only be exercised by Officers. In so ruling, the *Dueñas* court confirmed what the Supreme Court

---

citizen to a third country; does not create a path to lawful permanent resident status and citizenship; and does not permit a non-citizen's spouse or minor child to obtain lawful immigration status derivatively. *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[7] As noted above, prior to IIRIRA's establishment of the framework for expedited removal, Immigration Judges oversaw *all* removal proceedings.

recognized over a century ago: Only properly appointed Officers may exercise power to oversee and resolve removal cases. *See Nishimura Ekiu*, 142 U.S. at 659–60, 664. Even CBP recognizes the scope of authority given to immigration officers: its field manual notes that "[o]fficers should keep in mind that an order of expedited removal carries with it all of the penalties of an order of removal issued by an immigration judge" and the "officer's decision" is "final." Field Manual § 17.15(c). Indeed, CBP notes that immigration officers should "never process a case for expedited removal which you would not feel satisfied processing for a hearing before an immigration judge." *Id.* § 17.15(e).

Immigration officers in fact exercise *greater* authority under the expedited removal regime than do Immigration Judges in regular removal proceedings. Whereas removal orders issued by Immigration Judges are subject to BIA review and then review by Article III courts, expedited removal orders are subject to *no* review, not even by the Secretary. Whereas Immigration Judges adjudicate cases in which prosecutors present evidence against individuals w h o m the United States seeks to expel, immigration officers in expedited removal proceedings act as investigators, prosecutors, judges, and appeals courts, all at the same time. Thus, because Immigration Judges must be properly appointed Officers, the immigration officers who exercise more significant and less reviewable powers must be, too.

4. **Respondents Tweedie, Kane, and Tully, Like Other Immigration Officers, Are In "Continuing Positions Established by Law."**

Respondents Tweedie, Kane, and Tully are employees in continuing positions for purposes of the Appointments Clause. *See Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 511). The exception to the Appointments Clause requirement for non-continuing positions, which "embraces the ideas of tenure, duration, emolument, and duties," restricts the requirement of appointment to

positions that are "continuing and permanent, not occasional or temporary." *Germaine*, 99 U.S. at 511–12. It has no application here.

*First*, CBP officers such as Respondents Tweedie, Kane, and Tully are not "appointed essentially to accomplish a single task, and when that task is over the office is terminated." *Morrison*, 487 U.S. at 672.[8] As Chief Justice Marshall opined in 1823, "[a] man may certainly be employed under a contract . . . without becoming an officer. But if [his] duty be a continuing one, which is defined by rules prescribed by the government, and not by contract . . . [and] if those duties continue, though the person be changed; it seems very difficult to distinguish such a charge or employment from an office, or the person who performs the duties from an officer." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.); *see also* Officers of the United States Within the Meaning of the Appointments Clause, 31 U.S. Op. O.L.C. 73, 2007 WL 1405459, at *22 (Apr. 16, 2007) (position is continuing where duties are "not contingent on a particular person's holding it"); *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022), *cert. denied* 143 S. Ct. 868 (2023) (same).[9]

Moreover, Respondents Tweedie, Kane, and Tully, like other CBP officers, do not hold positions that are "transient or fleeting," *Donziger*, 38 F.4th at 297, but instead receive a fixed

---

[8] In *Morrison*, the Court found Independent Counsel Alexia Morrison to be an Officer under the Appointments Clause, even though she was authorized "to exercise all investigative and prosecutorial functions and powers of the Department of Justice" for purposes of only a single investigation. *See id.* at 660-63, 670–73. Likewise, with respect to bank receivers charged with winding up a specific bank, whose activity is discharged upon completion of that specific project, "it was the uniform view of the federal courts" at that time that these officials were "officers of the United States." *See* Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 110–11 (2007).

[9] In *Donziger*, the Second Circuit applied a three-part test to determine "whether a temporary position is an office: (1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position are more than incidental." 38 F.4th at 297 (citing Officers of the United States Within the Meaning of the Appointments Clause, 31 Op. O.L.C. at 112–13).

salary in exchange for ongoing performance of duties "which has any duration as to time." *Auffmordt v. Hedden*, 137 U.S. 310, 327–28 (1890); *see also Donziger*, 38 F.4th at 297 (duties that are "transient, occasional, or incidental" contrasted with those that are "durable, permanent, and continuous") (quoting *State v. Kennon*, 7 Ohio St. 546, 556 (1857)).

Finally, the expedited removal power exercised by Respondents Tweedie, Kane, and Tully is "more than incidental to the regular operations of government." *Donziger*, 38 F.4th at 297–98 (citing *Sheboygan County v. Parker*, 70 U.S. 93, 96 (1865)). The expedited removal of Dr. Alawieh is a single example of hundreds of thousands of removals that the federal government conducts each year. *See* U.S. Immigrants and Customs Enforcement, Fiscal Year 2024 Annual Report (December 19, 2024), https://www.ice.gov/doclib/eoy/iceAnnualReportFY2024.pdf. Again, Respondents Tweedie, Kane, and Tully exercised not just the "core power of [the] government" to prosecute Dr. Alawieh's removal, *Donziger*, 38 F.4th at 298, but also exercised the federal government's adjudicative authority by ultimately ordering her removed. This decision—whether to expel and ban her from re-entering the country for five years—is a "broad, undoubted," and "inherent power" of the federal government. *Arizona*, 567 U.S. at 394–95. It is far from incidental.

**5. Because the Expedited Removal Order Purportedly Entered Against Dr. Alawieh Was Issued by Unappointed Immigration Employees, It Must Be Vacated, and Dr. Alawieh's Visa Must Be Reinstated or Declared Valid.**

When an expedited removal order is issued by unappointed employees, it is invalid and void *ab initio*. *See Lucia*, 585 U.S. at 251; *see also Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11, 25 (D.D.C. 2022) (Appointments Clause violation renders challenged regulations "void *ab initio*."); *Ryder*, 515 U.S. at 179 (order issued by officials who "had not been appointed in accordance with the dictates of the Appointments Clause" is "not valid *de facto*."); *Brooks v. Kijakazi*, 60 F.4th 735, 741 (4th Cir. 2023) (Appointments Clause violation by Administrative Law

Judge renders decision a nullity). Dr. Alawieh therefore has not been lawfully ordered removed under 8 U.S.C. § 1225(b)(1).

As the Supreme Court has repeatedly held, "'one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case' is entitled to relief." *Lucia*, 585 U.S. at 251 (quoting *Ryder*, 515 U.S. at 182–83). "[A] litigant challenging governmental action as void on the basis of the separation of powers is not required to prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority." *Seila Law*, 591 U.S. at 211 (quoting *Free Enter. Fund*, 561 U.S. at 512 n.12); *see also id.* ("[W]e have found it sufficient that the challenger 'sustain[s] injury' from an executive act that allegedly exceeds the official's authority." (quoting *Bowsher v. Synar*, 478 U.S. 714, 721 (1986))).

Accordingly, the expedited removal order purportedly issued against Dr. Alawieh must be vacated. If Respondents wish to pursue removal, Dr. Alawieh must be provided removal proceedings under 8 U.S.C. § 1229a before an Officer appointed in compliance with the Appointments Clause. *See* 8 U.S.C. § 1252(e)(4); *Lucia*, 585 U.S. at 251. Additionally, because the expedited removal order purportedly issued against Dr. Alawieh is or will be a nullity, Respondents Tweedie, Kane, and Tully lacked authority to revoke Dr. Alawieh's visa under 22 C.F.R. § 41.122(e)(2), and that visa revocation is unlawful under the Administrative Procedure Act. The revocation of Dr. Alawieh's visa must be vacated, which would have the effect of reinstating her visa or declaring its validity.

### B. RESPONDENTS' APPLICATION OF EXPEDITED REMOVAL TO DR. ALAWIEH VIOLATES THE SUSPENSION CLAUSE.

Dr. Alawieh was lawfully present in the United States for almost seven years, developed substantial connections, left the country temporarily and attempted to return in order to deepen her

ties to her adopted home country by beginning a full-time position as a transplant nephrologist at Brown University. Am. Pet. at ¶¶ 1, 2, 8–11, 24–27. Respondents' decision to subject her to expedited removal therefore removal violates the Suspension Clause, and the expedited removal order should be vacated.

    **1.  Dr. Alawieh Has Established "Substantial Connections" to the United States.**

Dr. Alawieh has established substantial connections to the United States, and the Suspension Clause therefore applies to her. "[O]nce a[] [non-citizen] gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly." *Landon*, 459 U.S. at 32 (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)); *see also Kwong Hai Chew*, 344 U.S. 590, 600 (1953). In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), a Mexican national with no connections to the United States challenged a raid of his Mexican home by the U.S. Drug Enforcement Agency on the grounds that it violated the Fourth Amendment's proscription of unreasonable searches and seizures. *Id*. at 261–63. The Supreme Court ruled that non-citizens "receive constitutional protections when they have come within the territory of the U.S. and developed substantial connections with the country," but declined to extend those rights to the plaintiff there, *id*. at 271, because he "had no voluntary connection with this country that might place him among 'the people' of the United States." *Id*. at 273.

Dr. Alawieh, in contrast, has developed substantial connections to her adopted home country, such that she must be considered a part of "the people" to whom the protections of the Constitution apply. After entering the country lawfully, she resided in the United States under a valid visa for almost seven years. In the course of her time in the United States, she developed close professional and personal connections at a number of the country's most prestigious

academic institutions. In the course of her years training as a transplant nephrologist, she developed connections to the American patients to whom she provided life-saving medical treatment. Am. Pet. ¶¶ 1, 2, 8–11, 24–27.

In *Verdugo-Urquidez*, the Supreme Court stressed two factors to test whether the non-citizen had established "substantial connections" sufficient to be considered part of "the people" to whom the protection of the Bill of Rights applies: (1) whether the non-citizen is in the U.S. voluntarily, and whether he or she has "accepted some societal obligations." 494 U.S. at 260. In applying this test, various circuit and district courts have determined that plaintiffs with more tenuous connections to the United States than Dr. Alawieh have "substantial connections" sufficient to trigger constitutional protections. *See United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) (holding that non-citizen *unlawfully* in U.S. satisfied test because of long residence, sporadic work experience and relationships with U.S. family and friends); *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 996–97 (9th Cir. 2012) (holding that non-citizen pursuing her Ph.D. in the United States for four years had established significant voluntary connection with the United States such that she could invoke the First and Fifth Amendments); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) (holding that non-citizen and resident of Mexico who entered U.S. only to visit relative and procure social security check satisfied test for Fourth Amendment purposes, relying on *Verdugo-Urquidez* language requiring non-citizen had "accepted some societal obligations"); *Haitian Ctrs. Council*, 823 F. Supp. 1028, 1042 (E.D.N.Y. 1993) (holding that two-year confinement at U.S. facility in Guantánamo Bay, Cuba, established substantial connection to the United States to give rise to due process rights).

Here, Dr. Alawieh has accepted not only *some* "societal obligations" (and this is all that is required to satisfy the *Verdugo-Urquidez* test) but has accepted a level of societal obligation that

is nothing short of exemplary. She has dedicated her life to saving lives and chose to contribute her skills to improving the health and well-being of the American people. If courts have determined that even non-U.S. residents or residents who entered the U.S. unlawfully can establish substantial connections—see, e.g., *Meza-Rodriguez*, 798 F.3d at 670–71—then Dr. Alawieh certainly can.

### 2. Dr. Alawieh's Purpose for Leaving the United States Was Temporary.

Dr. Alawieh did not abandon her substantial connections when she left the U.S. in January 2025 for a brief vacation after having started work at Brown Medicine. Am. Pet. at ¶¶ 1, 26. The Supreme Court has repeatedly held that a non-citizen with substantial connections to the United States does not shed the protections of the constitution when they leave the country for the type of brief, lawful departure that characterizes Dr. Alawieh's vacation.

Individuals arriving in the United States for the first time and those returning after lawful residency are treated differently for constitutional purposes. Non-citizens "on the threshold of initial entry" are "on a different footing" than those "who have once passed through our gates, even illegally," and while the former may be summarily removed from the country, the latter are entitled to "traditional standards of fairness encompassed in due process of law" upon return to the United States. *Shaughnessy v. U.S. ex rel. Mezei*, 345 U.S. 206, 212 (1953). In *Kwong Hai Chew v. Colding*, a U.S. resident granted lawful status by an act of Congress left the U.S. on a four-month maritime work trip and was denied entry upon his return. 344 U.S. at 595. After the non-citizen was denied entry upon his return to the United States, the Supreme Court overturned the exclusion on the grounds that it would be "capricious" to deny him constitutional protections simply because he was located physically outside the country. *Id*. at 601. The non-citizen's "status as a person within the meaning and protection of the Fifth Amendment cannot be capriciously taken away from him." *Id*.  The Court held that it did not "regard the constitutional status which

petitioner indisputably enjoyed prior to his voyage as terminated by that voyage. From a constitutional point of view, he is entitled to due process without regard to whether or not, for immigration purposes, he is to be treated as an entrant [non-citizen] . . . " *Id.* at 600. "To simplify the issue," the Court explained, "[W]e consider first what would have been his constitutional right to a hearing had he not undertaken his voyage to foreign ports but had remained continuously within the territorial boundaries of the United States." *Id.* at 596.

The Supreme Court has not strayed from this distinction. *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (individuals lack constitutional protections when they are "unadmitted and nonresident"); *Landon*, 459 U.S. at 21, 37 (non-citizen lawful permanent resident who left the country for the purpose of committing smuggling of non-citizens still entitled to Constitutional protections despite the explicitly criminal purpose of her departure because she was not arriving at the border for the first time and had lived in the United States for five years).

In *Plasencia*, the Court explained that in its prior decisions it "did not suggest that no returning resident [non-citizen]" possesses constitutional rights, and it also recognized that a returning resident non-citizen's interest in gaining re-admission is a "weighty one." *Id.* at 34. Non-citizens who had resided in the U.S. "stand[] to lose the right 'to stay and live and work in this land of freedom'" and would be prevented from remaining with their friends and family, which the Court called "a right that ranks high among the interests of the individual." *Id.* at 34 (quoting *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)).[10]

Here, Dr. Alawieh is one of three kidney transplant nephrologists in the state of Rhode Island. She was detained, subjected to expedited removal, and banned from re-entering the country

---

[10] Additionally, applying the maximum consequences to Dr. Alawieh's departure would run afoul of *Rosenberg v. Fleuti*, 374 U.S. 449, 458, 461 (1963), which instructed lower courts to "ameliorat[e] the harsh results" of the consequences of a brief, innocent departure from the country. *Id.*; *see also Delgadillo v. Carmichael*, 332 U.S. 388 (1947).

for five years without any process whatsoever because she visited her family abroad. She was in the process of deepening her ties to the United States, having begun work with Brown Medicine. As a non-citizen who is part of "the people" because of her substantial connections to the United States, Dr. Alawieh's detention and placement in expedited removal violate the Suspension Clause. The expedited removal order should therefore be vacated.

## C.  THIS COURT HAS JURISDICTION OVER ALL OF DR. ALAWIEH'S CLAIMS, AND SHE HAS STANDING TO BRING THEM.

This Court has subject-matter jurisdiction over Dr. Alawieh's claims because the statutory framework governing expedited removal provides for judicial review of habeas corpus petitions that challenge whether the non-citizen "was ordered removed" in the first place.  *See* 8 U.S.C. §§ 1252(e)(2), 1252(e)(5). Here, the expedited removal order issued against Dr. Alawieh is void *ab initio* because Respondents Tweedy, Kane, and Sully are immigration officers who exercise significant authority in continuing positions, and they were not appointed to their positions as required by article II, section 2, clause 2 of the U.S. Constitution. Because orders that are void *ab initio* are treated as though they were never issued at all, the statute grants this Court jurisdiction over Dr. Alawieh's claims. *See, e.g.*, *Dugdale v. U.S. Customs & Border Prot*., 88 F. Supp. 3d 1, 6 (D.D.C. 2015) (concluding that the scope of review under § 1252(e)(2)(B) "fairly encompasses claims that a purported expedited removal order was invalid on its face or was not lawfully issued due to some procedural defect.") *aff'd sub nom. Dugdale v. Lynch*, 672 F. App'x 35 (D.C. Cir. 2016)); *accord D.A.M. v. Barr*, 486 F. Supp. 3d 404, 419 (D.D.C. 2020) (*Dugdale* requires that petitioners "must raise a claim that their removal orders were, as a matter of law, *not* issued") (emphasis in original); *Kansas City S. Ry. Co. v. Great Lakes Carbon Corp*., 624 F.2d 822, 825 (8th Cir. 1980) ("[A] void judgment, as opposed to an erroneous one, is one which from its inception"— i.e., *ab initio*—"was legally ineffective.") (citing *Williams v. North Carolina*, 325 U.S. 226 (1945)).

Even if the Court were to read 8 U.S.C. §§1252(e)(2) and (e)(5) to strip review of Dr. Alawieh's claims, such a reading would render those provisions unconstitutional. Dr. Alawieh has substantial connections to the United States—Am. Pet. at ¶¶ 1, 2, 8–11, 24–27—which enable her to invoke the Suspension Clause, and the expedited removal process does not provide an adequate or effective alternative to challenge the legality of her removal. *See, e.g.*, *Osorio-Martinez v. Attorney General United States of America*, 893 F.3d 153, 166 (3d Cir. 2018) (citing *Boumediene v. Bush*, 553 U.S. 723, 739 (2008)); *INS v. St. Cyr*, 533 U.S. 289, 301 (2001).

Finally, Dr. Alawieh has standing to bring her claims. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (standing requires injury that is "concrete, particularized, and actual or imminent") (quoting *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (standing also requires "causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant," as well as "redressability—a likelihood that the requested relief will redress the alleged injury."). Here, Dr. Alawieh has standing for at least two reasons. First, she had standing when she initiated her lawsuit, because, at the time, Respondents had custody of her. Verified Pet. for Writ of Habeas Corpus and Compl. for Decl. and Injunctive Relief, ECF No. 1; Am. Pet. at ¶¶ 18, 26–29; *Banks v. Gonzales*, 496 F. Supp. 2d 146, 149 (D.D.C. 2007) (habeas petitioner "must have been in custody at the time the habeas petition was filed.") (citing *Neville v. Cavanagh*, 611 F. 2d 673, 675 (7th Cir. 1979)). Second, Dr. Alawieh maintains standing because she is suffering ongoing collateral consequences from Respondents' custody, because of their unauthorized cancellation of her visa and entry of an expedited removal order, which subjects her to a five-year bar on reentry into the United States. Am. Pet. at ¶¶ 2, 4, 18, 27; *Qassim v. Bush*, 466 F.3d 1073,

1078 (D.C. Cir. 2006) (per curiam) (post-custody standing for habeas claim requires demonstrating

"collateral consequences") (citing *Spencer v. Kemna,* 523 U.S. 1, 7 (1998)).

## **CONCLUSION**

For all of the foregoing reasons, the Court should grant all of the relief that Dr. Alawieh's

Amended Petition requests.

Dated: May 16, 2025

Respectfully submitted,

*/s/ Stephanie E.Y. Marzouk*                     */s/ Golnaz Fakhimi*
Stephanie E.Y. Marzouk                            Golnaz Fakhimi*
Marzouk Law LLC                                   Sadaf Hasan*
2464 Massachusetts Ave Ste 317                    Eric Lee*
Cambridge, MA 02140                               Muslim Advocates
Tel: (617) 674-2112                               1032 15th Street N.W. #362
Email: sym@marzouklaw.com                         Washington, D.C. 20005
                                                  Tel: (202) 655-2969
                                                  Email: golnaz@muslimadvocates.org


*Attorneys for Petitioner*
*Admitted* Pro Hac Vice

## CERTIFICATE OF SERVICE

I, Golnaz Fakhimi, hereby certify that I transmitted the foregoing documents electronically through the Case Management / Electronic Case Filing ("CM/ECF") system to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Golnaz Fakhimi*
Golnaz Fakhimi